UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
DANIELLE JEANETTE SCHWARTZ,

                Plaintiff,                              **MEMORANDUM AND ORDER**

    - against -                                              19-CV-1262 (RRM)

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.
-------------------------------------------------------------------x
ROSLYNN R. MAUSKOPF, United States District Judge.

      Danielle Jeanette Schwartz brings this action against the Commissioner of Social Security ("Commissioner"), seeking review of the Commissioner's determination that she was not disabled and, therefore, not eligible for Disability Insurance Benefits ("DIB") for the period of September 23, 2011, through December 20, 2013. Schwartz and the Commissioner now cross-move for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c). (Pl.'s Mot. (Doc. No. 17); Def.'s Mot. (Doc. No. 19).) For the reasons set forth below, the Commissioner's motion is denied, and Schwartz's motion is granted to the extent that it seeks remand.

## BACKGROUND

      Schwartz was 34 years old on the April 4, 2017, alleged disability onset date and 36 years old as of the September 27, 2018, ALJ decision. Tr. 37.[1] She has a high school education and had not worked on a full-time basis since July 2016, when her husband had a stroke. Tr. 43–45, 48–49. Her past work included employment as a store clerk and a photographer. Tr. 37, 43–44.

---

[1] Citations preceded by "Tr." refer to the Administrative Record (Doc. No. 22) and use original pagination. All other page numbers refer to ECF pagination.

I.      **Medical Evidence**

A May 17, 2017, MRI of Schwartz's right knee revealed: (1) mild lateral subluxation of the patella, (2) superficial cartilage loss predominately in the patellofemoral compartment, (3) soft tissue edema on the anterior aspect of the knee, and (4) no evidence for meniscal or ligament tears.  Tr. 291.  Schwartz saw Dr. Paul Dicpinigaitis, an orthopedist, with complaints of right knee pain and reported that she had previously been diagnosed with right knee patella-femoral syndrome and chondromalacia patellae, or pain caused by damage to the cartilage under the kneecap.  Tr. 287, 294.  She rated her pain as a 7–10/10 and said that she took four tablets of Oxycodone a day for pain relief.  Tr. 287, 294.

A physical examination revealed that Schwartz was 5' 8" tall, weighed 275 pounds, and had right knee swelling, full range of motion, tenderness, and crepitus with range of motion.  Tr. 288, 294–95.  She had full (5/5) motor strength in her upper and lower extremities as well as intact range of motion, sensation, and reflexes.  Tr. 288, 295.  A psychiatric exam revealed her mood and affect were normal and socially appropriate.  Tr. 288, 295.  Her behavior was normal and thought content and judgment were normal.  Tr. 288, 295.  Dr. Dicpinigaitis confirmed Schwartz's diagnosis of chondromalacia patellae of the right knee and prescribed Oxycodone as needed for pain.  Tr. 289, 296.  He also recommended that Schwartz wear an orthopedic brace and undergo right knee reconstructive surgery, which Dr. Dicpinigaitis scheduled for June 2017.  Tr. 289, 296.  Dr. Dicpinigaitis advised Schwartz that her prognosis was guarded given her other impairments.  Tr. 289, 296. Specifically, Dr. Dicpinigaitis identified her diagnoses of obesity; fibromyalgia, a disorder characterized by widespread musculoskeletal pain; possible rheumatoid arthritis; and Raynaud phenomenon (also known as Raynaud's disease), a condition which causes the smaller arteries that supply blood to the skin to constrict excessively in response to

2

cold, limiting blood supply to extremities such as fingers and toes; as well as the "limitations of patella-femoral surgery." Tr. 289.

On June 26, 2017, Christine Stamatos, a nurse practitioner and a Doctor of Nursing Practice ("DNP"), noted Schwartz's history of chronic back pain and diffuse joint pain progressively worsened over the past several months. Tr. 340. DNP Stamatos ordered an updated lumbar MRI and X-rays. Tr. 341. A July 7, 2017, MRI of Schwartz's lumbar spine revealed degenerative changes. Tr. 322. Specifically, there were normal results except: (1) "L2-3: Small disc bulge without significant, minus of the spinal canal. Mild narrowing of the left neural foramen is seen;" (2) "L4-5: Bilateral hypertrophic facet joint changes are seen. Moderate to severe narrowing of both neural foramen is seen," and; (3) "L5-S1: Bilateral hypertrophic facet joint changes are seen with disc bulge. Mild narrowing of the spinal canal is seen." Tr. 322.

Schwartz saw Jonathan Klonsky, MD, for a bariatric surgery consult on July 19, 2017. Tr. 317. She was advised to go on a medically supervised diet for at least three months and lose weight prior to surgery. Tr. 317.

On July 27, 2017, NP Stamatos observed that Schwartz used medical marijuana with an excellent response and nearly "full" resolution of pain. Tr. 329. She noted that Schwartz wanted to minimize her pain medications as much as possible, e.g. "Gabapentin tapering off and tolerating w/out severe increase in pain." Tr. 329. NP Stamatos also reported that Schwartz had anxiety and depression, which was better with a low dose of Zoloft, an antidepressant. Tr. 329. She noted that much of Schwartz's anxiety seemed situational because Schwartz had multiple family stressors. Tr. 329. A psychiatric evaluation showed Schwartz was oriented to person, place, and time. Tr. 329. Her insight and judgment were intact, and her affect was normal. Tr.

3

329.  She was frustrated and anxious and admitted to tremendous stress.  Tr. 329.  NP Stamatos said that despite fatigue, Schwartz was high functioning, "cleaning houses during daytime" to make money, and caring for multiple family members with multiple issues.  Tr. 329.

On October 20, 2017, Schwartz saw Dr. Kathleen Acer, Ph.D., for a consultative psychiatric examination.  Tr. 405.  Dr. Acer reported that Schwartz was driven to the appointment by a friend.  Tr. 405.  Schwartz was taking the following medications: medical marijuana; Zoloft; hydroxyzine, a sleep aid; gabapentin, a nerve pain mediation also used to treat mood disorders; cyclobenzaprine, a muscle relaxer; clonazepam; a medication used to treat panic disorders; ibuprofen; and lidocaine patches.  Tr. 405.  Schwartz reported difficulty falling and staying asleep.  Tr. 405.  Her appetite was normal.  Tr. 405.  She reported depressed mood, crying spells, loss of usual interests, fatigue, lack of energy or motivation, mood swings, irritability, social withdrawal, anxiety, and nervousness.  Tr. 405.  Schwartz had panic attacks, heart palpitations, sweating, dizziness, trembling, and shaking lasting 45 minutes at a time and occurring at least once a week.  Tr. 405.  She had no symptoms of a formal thought disorder and no suicidal or homicidal ideation.  Tr. 405.

Dr. Acer found that Schwartz had a cooperative and appropriate demeanor.  Tr. 406.  Her speech was fluent and clear, and her posture was tense and her motor behavior was restless.  Tr. 406.  Her thought processes were coherent and directed; she showed no evidence of hallucinations, delusions, or paranoia; and her affect was of full range.  Tr. 406.  Schwartz was alert and oriented but her attention and concentration were mildly impaired; she was able to count and do simply calculations but she could not count in serial 7s.  Tr. 406.  Schwartz's recent and remote memory skills were also impaired:  she was able to recall 3 out of 3 objects immediately, and 1 out of 3 after five minutes; she could recall 4 digits forward and 2 digits

4

back. Tr. 406. Her cognitive function was average, and her insight and judgment were fair. Tr. 407. Schwartz reported that she could dress, bathe, and groom herself but needed assistance with household responsibilities, did not drive, and had minimal social interactions. Tr. 407. Dr. Acer found that Schwartz had mild limitations in understanding, remembering, and applying complex instructions and directions; using reason and judgment to make work-related decisions; interacting appropriately with others; sustaining attention and concentration; and regulating emotions. Tr. 407. Dr. Acer found that Schwartz's psychiatric issues, which she diagnosed as "persistent depressive disorder," did "not appear to be severely hampering functioning" but that Schwartz "would benefit from ongoing counseling and psychiatric treatment." Tr. 407.

On October 30, 2017, state agency consultant Dr. Blackwell, who did not examine Schwartz, reviewed the evidence in the record thus far and recommended a finding that Schwartz was not disabled. Tr. 93. Dr. Blackwell considered whether Schwartz's symptoms and diagnosed ailments satisfied the requirements of Listing 12.04: Depressive, Bipolar, and Related Disorders; and Listing 1.04: Spine Disorders; he found that they did not. Tr. 89–90. Dr. Blackwell opined that Schwartz had a residual functional capacity ("RFC") of light work with the following limitations: she could occasionally lift or carry 20 pounds; frequently carry 10 pounds; occasionally climb ramps, stairs, ropes, and scaffolds; occasionally stoop, kneel, crouch, or crawl; and she had no manipulative, communicative, visual, or environmental limitations. Tr. 89–91.

On April 23, 2018, Adam Shestack, M.D., noted Schwartz reported pain in her lower back with radiation to her bilateral flanks and buttocks. Tr. 551. She described the pain as aching and stabbing and said that it worsened with activity including prolonged standing and bending. Tr. 551. Schwartz further reported diffuse joint pain, muscle aches, a history of

5

fibromyalgia, and difficulty with activities of daily living. Tr. 551. A physical examination revealed tenderness and a reduced range of motion of the lumbar spine, in addition to diminished sensation of the left lateral calf and an antalgic gait. Tr. 552. Schwartz was status-post bilateral L4-L5 and L5-S1 lumbar facet injections, which provided good improvement of pain, though the pain returned and was worse with prolonged standing and backward bending. Tr. 551. Dr. Shestack diagnosed spondylosis of the lumbosacral region without myelopathy or radiculopathy and myalgia. Tr. 552. These examination results and diagnoses were repeated on June 4, July 2, July 31, and August 28, 2018. Tr. 553–62. Dr. Shestack advised Schwartz to maintain an ideal body weight and follow up with Dr. Klonsky for gastric sleeve surgery. Tr. 552. Dr. Shestack stated that Schwartz's quality of life and functional ability improved on medication. Tr. 552.

On June 26, 2018, Schwartz saw Doctor of Osteopathy ("D.O.") Gina Greco, at East Meadow Family Practice, for a medication recheck and complained of "pain everywhere." Tr. 522. She reported chronic low back pain and right hip pain that was worse with walking, though she had been walking daily to help lose weight. Tr. 522. Schwartz also complained of joint pain, stiffness, muscle aches, anxiety, and depression. Tr. 525. On examination, she was alert and cooperative, with a normal mood and a normal attention span. Tr. 526. Schwartz was diagnosed with arthralgia, or joint pain; Sjogren's syndrome, a disorder of the moisture-producing glands that can lead to chronic dryness of the eyes and mouth; right hip pain; chronic pain syndrome; hypertension, or high blood pressure; fibromyalgia; lower back pain; anxiety; and depression. Tr. 527. For her anxiety and her pain she was taking Klonopin, Hydroxyzine, Zoloft, and Gabapentin. Tr. 527.

On August 15, 2018, Schwartz saw Chantale Vante, M.D., an internal medicine specialist, for a consultative examination. Tr. 507. Dr. Vante considered Schwartz's medical

6

history and complaints.  Tr. 507-08.  Dr. Vante noted Schwartz's activities of daily living included:

> She does cooking once a week.  She does not do any cleaning or laundry due to the pains from the fibromyalgia.  She needs help with shopping as she cannot carry large packages.  Childcare is not needed.  She is able to shower, bathe, and dress herself.  Her activities include watching TV, listening to the radio, playing sports, and socializing with friends.

Tr. 509.  Dr. Vante noted that Schwartz reported that her hands turned stiff and blue in the wintertime.  Tr. 508.

On examination, Schwartz was 5' 7" and weighed 303 pounds.  Tr. 509.  She appeared to be in no acute distress, had a normal gait and stance, was unable to walk on her heels or toes, did not want to attempt to squat as she was afraid she would not be able to get up, used no assistive devices, needed no help changing for exam or getting on and off the examination table, and was able to rise from chair without difficulty.  Tr. 509.  Examination of the cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  Tr. 510.  She had no scoliosis, kyphosis, or abnormality in the thoracic spine.  Tr. 510.  She had tenderness to palpation in the lower back.  Tr. 510.  Examination of the lumbar spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally.  Tr. 510.  Straight leg raises were negative bilaterally.  Tr. 510.  Shoulder forward elevation bilaterally was 110 degrees, shoulder abduction bilaterally was 110 degrees, shoulder adduction bilaterally was 20 degrees, shoulder internal rotation was full bilaterally at 40 degrees, and shoulder external rotation was full bilaterally at 90 degrees.  Tr. 510.  She had full range of motion in her elbows, forearms, wrists, hips, knees, and ankles.  Tr. 510.  She had no evidence of subluxations, contractures, ankylosis, or thickening.  Tr. 510.  Her joints were stable and non-tender, with no redness, heat, swelling, or effusion.  Tr. 510.  Dr. Vante noted: "[h]er trigger points for

7

fibromyalgia included both shoulders, both elbows, and both knees, so that is 6 trigger points." Tr. 510. She had physiologic and equal deep tendon reflexes in her upper and lower extremities, with no sensory deficit. Tr. 510. Her left lower extremity strength was 4/5, her right lower extremity strength was 5/5, and her strength in her upper extremities was 5/5. Tr. 510. No muscle atrophy was evident. Tr. 510. She had intact hand and finger dexterity and bilateral grip strength of 5/5. Tr. 511.

Dr. Vante diagnosed the following etiologies: fibromyalgia; herniated lumbar discs causing left lower leg neuropathy; asthma; Raynaud phenomenon; erythromelalgia, a condition characterized by episodes of pain, redness, and swelling in various parts of the body, particularly the hands and feet, in response to a change in body temperature; irritable bowel syndrome; right knee pain; and hypertension. Tr. 511. Dr. Vante assigned a "fair" prognosis and opined: "on the basis of my examination, the claimant has moderate limitations to prolonged walking, stair climbing, and squatting. She also has moderate limitations to heavy lifting, pushing, or pulling." Tr. 511.

In a medical source statement dated August 15, 2018, Dr. Vante assessed that Schwartz could: (1) continuously lift and carry up to 10 lbs.; (2) sit and stand each for a total of three hours in an eight-hour workday, for up to three hours each at one time without interruption; (3) walk for a total of two hours in an eight-hour work day, for up to two hours at one time without interruption; (4) occasionally push/pull, continuously feel and operate foot controls, and frequently reach (in all directions), handle, and finger; (5) never climb ladders or scaffolds, but occasionally climb stairs or ramps, balance, stoop, kneel, crouch, or crawl; (6) never work in extreme cold or heat or tolerate exposure to vibrations, and; (7) occasionally work around unprotected heights, moving mechanical parts, operating a motor vehicle, humidity, and wetness,

and dust, odors, fumes, and pulmonary irritants. Tr. 514-15. Dr. Vante stated Schwartz did not require a cane to ambulate. Tr. 513. Dr. Vante noted Schwartz could perform activities such as shopping; travel without a companion for assistance; ambulate without using an assistive device (e.g., a wheelchair, walker, or 2 canes or 2 crutches); walk a block at a reasonable pace on rough or uneven services; use standard public transportation; climb a few steps at a reasonable pace with the use of a single handrail; prepare a simple meal and feed herself; care for her personal hygiene; and sort, handle, or use paper files. Tr. 517.

Schwartz returned to Dr. Dicpinigaitis on August 23, 2018, with complaints of worsening right knee pain and right hip pain. Tr. 547. On examination, Schwartz ambulated without an assistive device and with a "trace/faint antalgic gait." Tr. 549. She had intact range of motion in her right hip. Tr. 549. Dr. Dicpinigaitis noted that Schwartz's active problems include anxiety; chondromalacia patellae, right knee; fibromyalgia; inflammatory back pain; left lumbar radiculopathy; morbid obesity (5' 7" and 312 pounds); neuropathy; patellofemoral arthritis of the right knee; Raynaud's disease; and depression. Tr. 547. Dr. Dicpinigaitis diagnosed right knee chondromalacia patella/patella-femoral syndrome and right hip greater troch bursitis, and right sacroiliitis. Tr. 550.

## II.     Administrative Hearing and Expert Testimony

Schwartz, represented by counsel, appeared at a hearing before Administrative Law Judge ("ALJ") Alan B. Berkowitz on September 14, 2018. Tr. 35. She testified that she was homeless and lived in a hotel with her husband and children (ages 12 (with autism), 9 (with attention deficit hyperactivity disorder (ADHD)), and 6), which was paid for by her father so that the family would not have to live in a shelter. Tr. 41–42. The last time she worked, she said, was in 2016, when she stocked shelves overnight at CVS. Tr. 43. She testified that she was

mostly well until her husband suffered a stroke in July 2016, at which time she began caring for him, in addition to her three children (two of which have a disability), which was mentally and physically challenging.  Tr. 45.

Schwartz testified she was 5'7" and weighed 303 pounds.  Tr. 42.  She indicated she was unable to work due to limitations caused by chondromalacia in her right knee, fibromyalgia, lumbar radiculopathy, Raynaud's syndrome, patellofemoral arthritis, erythromelalgia, neuropathy, and depressive disorder.  Tr. 38.  Schwartz testified that she had difficulty bending and lifting.  Tr. 45.  She had difficulty with activities of daily living including cooking, cleaning, and shopping.  Tr. 46.  She did not go out alone because she is both mentally and physically unstable and she did not feel comfortable driving.  Tr. 47.  She relied on others, including her son's Community Habilitation worker, for transportation and care for her husband and son.  Tr. 49.

Schwartz's medications at the time of the hearing included Zoloft, Wellbutrin, Gabapentin, Klonopin, Hydrochlorothiazide, Flexeril, Hydroxyzine, and baby aspirin.  Tr. 51.  She testified that she did not see a psychiatrist because she was unable to find a provider that accepted her insurance.  Tr. 50.  She recently received a steroid shot in her hip and had a bariatric surgery consultation, but testified that the surgeon wanted her to lose 35 pounds before having surgery.  Tr. 54.  Schwartz testified she had asthma, which was exacerbated by extreme fumes and temperatures.  Tr. 54–55.  She had pain in her hands, knee, hip, and lower back and constant neuropathy from her hips to her feet.  Tr. 55.  Schwartz testified that she could sit for only five to six minutes at a time and that sitting during her testimony was causing her "excruciating pain."  Tr. 60.  She usually stood for about 10 minutes before she had to lie down.  Tr. 61.  Schwartz used a cane for ambulation, but did not have it at the hearing because she was unsure it would be

allowed in the courthouse. Tr. 61. She testified that her Raynaud's syndrome and arthritis caused a pins and needles sensation and swelling in her hands. Tr. 55-56. She testified that she had trouble using her hands and had difficulty typing and gripping. Tr. 61.

A vocational expert ("VE") also testified at the hearing. The VE testified that Schwartz's past work included a laborer in stores (medium/unskilled) and photographer. Tr. 65-66.

The ALJ then asked the VE to "assume a person of the same age, educational background, work history, and transferable skills" that can do the following:

> perform sedentary work, with the ability to sit for 30 minutes at once; every 30 minutes would require a repositioning break. They can occasionally stoop, crouch, crawl, kneel, squat, and climb. Simple tasks; low stress; occasionally decision making and changes in the work setting. No extreme hot; no extreme cold; no exposure to concentrated fumes, respiratory irritants, extreme hot, extreme cold. Occasionally push/pull.

Tr. 66.

The VE testified that this hypothetical individual would not be able to perform Schwartz's past work. Tr. 66. The VE further testified, however, that this hypothetical individual would be able to perform other representative unskilled and sedentary positions in the national economy such as document preparer (Dictionary of Occupational Titles ("DOT") No. 249.587-018), ticket taker (DOT No. 219.587-010), and order clerk (DOT No. 209.567-014). Tr. 66–67. However, assuming the additional limitation of only occasionally using their hands for fine and gross motor skills, the VE testified that such an individual would not be able to sustain any competitive work activity because sedentary work requires more than occasional use of the hands. Tr. 67–68.

The ALJ then asked the VE to consider another hypothetical individual who could lift up to ten pounds; sit for three hours; stand for three hours; walk for two hours; occasionally stoop, crouch, crawl, kneel, squat and climb; and perform simple tasks, in low stress settings, with only

11

occasional decision making and changes in the work setting.  Tr. 67.  The VE testified that such an individual would not be able to sustain any competitive work activity because sedentary work required sitting for longer than three hours.  Tr. 67–68 ("[E]ven at sedentary, if you can only sit for three hours.").

### III.    The ALJ's Decision

On September 27, 2018, ALJ Berkowitz issued an unfavorable decision, finding that Schwartz was not disabled.  Tr. 8–20.  After determining that Schwartz met the insured status requirements of the Social Security Act through December 31, 2021, the ALJ followed the familiar five-step process for making disability determinations, which the Second Circuit has described as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the Commissioner will consider him [*per se*] disabled .... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)).

At step one, the ALJ found that Schwartz had not engaged in substantial gainful activity since April 4, 2017, the alleged onset date.  Tr. 13.  At step two, the ALJ found that Schwartz had the following severe impairments:  fibromyalgia, neuropathy, paresthesia, anxiety,

depression, arthralgia, lumbar radiculopathy, Raynaud's phenomenon, osteoarthritis, and morbid obesity. Tr. 13. At step three, the ALJ found that Schwartz did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. part 404, subpart P, appendix 1. The ALJ specifically considered Listing 12.04, depressive, bipolar, and related disorders; and Listing 12.06, anxiety and obsessive-compulsive disorders. Tr. 14–15.

At step four, the ALJ found that Schwartz had the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except she could sit for 30 minutes followed by a two minute repositioning break; she could only occasionally stoop, kneel, crouch, crawl, squat, and climb ramps and stairs; she could perform only simple tasks, low stress work with occasional decision making and changes in the work setting; she could only occasionally push and pull, and she could not work in extreme hot or cold temperatures or have exposure to concentrated fumes and respiratory irritants. Tr. 15. Accordingly, the ALJ found that though Sepulveda could not perform her past relevant work, there are jobs that exist in significant numbers in the national economy that Schwartz could perform, such as document preparer (Dictionary of Occupational Titles ("DOT") 249.587-018), ticket taker (DOT 219.587-010), and order clerk (DOT 209.567-014). Tr. 20.

In reaching the decision regarding Schwartz's RFC, the ALJ stated that he found Dr. Vante's opinion "somewhat persuasive in many facets" with the exception of "the limitation for sitting," which the ALJ found was not supported by the record or Dr. Vante's "findings on examination of the claimant." Tr. 17. Further, the ALJ found that "there is no support for a finding that the claimant has any limitation in her ability to handle and finger." Tr. 17. The ALJ also found the opinion consultative psychological examiner Dr. Acer to be "persuasive" and the

13

opinion of state consultative examiner Dr. Blackwell "somewhat persuasive." Tr. 18–19. Based on this review of the opinion evidence, the ALJ found that "the medical evidence of record establishes the claimant has the severe impairments listed above, but while they impose some functional limitations of her, she retains the residual functional capacity to perform a wide range of sedentary work." Tr. 19.

On January 3, 2019, the Appeals Council denied Schwartz's Request for Review of the ALJ's decision, making the ALJ's decision the final decision of the Commissioner, pursuant to 42 U.S.C. § 405(g). Tr. 1–24, 172–74. This action followed.

## IV.   The Instant Appeal

Schwartz and the Commissioner now cross-move for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. In her Memorandum of Law, Schwartz argues that the ALJ's erred at step four by failing to consider the effect of all the severe impairments identified at step two, including Raynaud's disease, neuropathy, and obesity, when formulating the RFC. (Pl.'s Mem. (Doc. No. 18) at 15–16.) Schwartz also argues that the ALJ erred at step three by failing to consider Listing 1.04, disorders of the spine, and Listing 1.02, which "requires, in relevant part, 'chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s),' with '[i]nvolvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively.'" (*Id*. at 19, citing 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02.)

In response, the Commissioner first argues that the ALJ's decision makes clear that he considered medical evidence from treating sources who had diagnosed Raynaud's disease, neuropathy, and obesity, indicating that the ALJ properly considered all the impairments he identified at step two when determining Schwartz's RFC. (Def.'s Mem. (Doc. No. 20) at 14–

14

19.)  Further, the Commissioner argues that the ALJ's RFC determination was supported by substantial evidence.  (*Id*. at 15–19.)  Finally, the Commissioner argues that Schwartz's impairments did not carry her burden to demonstrate that her impairments met or equaled Listings 1.02 or 1.04, as she presented no evidence that she suffered from an inability to ambulate effectively, so the ALJ was not required to articulate specific evidence that she did or did not meet that listing.  (*Id*. at 19–23.)

In reply, Schwartz largely stands upon her prior briefing, and argues that the ALJ having given consideration to the opinions of doctors who were aware of Schwartz's impairments is not evidence that the ALJ actually considered all of those impairments when formulating the RFC.  (Pl.'s Reply (Doc. No. 21) at 2–4.  Additionally, she argues that the ALJ cherry-picked evidence to support his finding that she was not disabled.  (*Id*. at 3.)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the Commissioner's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" connotes "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v.*

15

*Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002). "In determining whether substantial evidence supports a finding of the Secretary [now, Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn." *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991). The "substantial evidence" test applies only to the Commissioner's factual determinations. Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation. *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration. *Zabala v. Ast*rue, 595 F.3d 402, 409 (2d Cir. 2010).

Eligibility for DIB

A claimant must show that he is "disabled" in order to qualify for DIB. *See, e.g.*, *Lugo v. Berryhill*, 390 F. Supp. 3d 453, 457 (S.D.N.Y. 2019). In this context, disability means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). "An individual shall be determined to be under a disability only if his physical or

16

mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." *Id.* § 423(d)(2)(A). The term, "work which exists in the national economy," is defined to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.*

In deciding whether a claimant is disabled, the Commissioner is required by the Social Security regulations to use the five-step framework described above on page 12, above. *See McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (quoting 20 C.F.R. §§ 404.1520(a)(4)(i) – (v)). "The claimant has the general burden of proving that he or she has a disability within the meaning of the Act, *see*, *e.g.*, *Draegert v. Barnhart*, 311 F.3d at 472, and 'bears the burden of proving his or her case at steps one through four' of the sequential five-step framework.... *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004)." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Nonetheless, "[b]ecause a hearing on disability benefits is a nonadversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record." *Id.* (quoting *Melville v. Apfel*, 198 F.3d 45, 51 (2d Cir. 1999)).

## DISCUSSION

Here, the ALJ erred by failing to consider Schwartz's neuropathy, Raynaud's disease, and obesity in formulating the RFC. A residual functional capacity determination must be based on "all … medically determinable impairments of which [the Commissioner is] aware" from all

17

relevant medical and other evidence, including plaintiff's subjective complaints of pain and other limitations. 20 C.F.R. § 416.945(a)(3). "The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical or other evidence." SSR 96-8p. "An ALJ's failure to account for an impairment in the RFC analysis is grounds for remand." *Davila v. Comm'r of Soc. Sec.*, No. 16-CV-4774 (KAM), 2018 WL 5017748, at *5 (E.D.N.Y. Oct. 16, 2018) (citing *Parker-Grose v. Astrue*, 462 F. App'x 16, 18 (2d Cir. 2012) (summary order)).

At step two, ALJ Berkowitz found that Schwartz's neuropathy and Raynaud's disease were severe impairments. However, in formulating the RFC, the ALJ failed to mention these diagnoses, only noting in passing that "she says she has a problem with her hands." Tr. 15. The ALJ then departed from Dr. Vante's opinion that Schwartz could sit and stand each for a total of three hours in an eight-hour workday, for up to three hours each at one time without interruption and could frequently reach, handle, and finger, because he found no support for these limitations in the record. Tr. 17. But Dr. Vante's opinion was supported by extensive medical evidence.

First, the limitations on sitting were supported by the lumbar spine MRI taken on July 7, 2017, showing degenerative changes, a disc bulge at L2-L3, and foraminal narrowing at L4-L5. Tr. 322. This pain, which Dr. Shestack treated with two lumbar facet injections, radiated to her bilateral flanks and buttocks and caused diminished sensation of the left lateral calf and an antalgic gait. Tr. 552. These findings are consistent with Schwartz's testimony that she had pain in her lower back and constant neuropathy from her hips to her feet, and that sitting caused her pain. Tr. 55–56, 61.

Second, Dr. Vante's recommended manipulative limitations are supported by the medical evidence of Schwartz's Raynaud's disease. Dr. Dicpinigaitis counseled Schwartz that her

18

prognosis was guarded due to her Raynaud's disease, Tr. 289, and Dr. Vante also diagnosed Raynaud phenomenon on the basis of Schwartz's report that her hands turn blue in the wintertime, Tr. 511. This diagnosis is consistent with Schwartz's testimony that she has pins and needles in her hands and has trouble gripping and typing. Tr. 55–56, 61. Dr. Vante's examination found that Schwartz had no limitations in grip strength, but it was conducted in August, and is not inconsistent with limitations to gripping or fingering during periods of colder weather.

The ALJ also failed to address Schwartz's obesity in formulating the RFC. Obesity may be considered "severe"—and thus medically equal to a listed disability—if "alone or in combination with another medically determinable physical or mental impairment(s), it significantly limits an individual's physical or mental ability to do basic work activities." *See* SSR 02–1p, Titles II and XVI Evaluation of Obesity, 67 Fed.Reg. 57859, 57861–62 (Sept. 12, 2002). Thus, an ALJ must consider the effects of obesity when evaluating disability. *See* SSR 00–3p, Titles II and XVI Evaluation of Obesity, 65 Fed.Reg. 31039, 31039 (May 15, 2000). However, "obesity is not in and of itself a disability," and "an ALJ's failure to explicitly address a claimant's obesity does not warrant remand." *Guadalupe v. Barnhart*, No. 04-CV-7644 (HB), 2005 WL 2033380, at *6 (S.D.N.Y. Aug. 24, 2005) (citations omitted). "[W]here the record contains evidence indicating limitation of function due to obesity, the ALJ must consider the effect of obesity on the claimant's ability to do basic work activities at steps two through four of the sequential evaluation process." *Battle v. Colvin*, No. 13-CV-547 (JTC), 2014 WL 5089502, at *5 (W.D.N.Y. Oct. 9, 2014) (citation omitted). "'Conversely, the ALJ's obligation to discuss a claimant's obesity alone, or in combination with other impairments, diminishes where evidence in the record indicates the claimant's treating or examining sources did not consider obesity as a

19

significant factor in relation to the claimant's ability to perform work related activities.'" *Id*. (quoting *Farnham v. Astrue*, 832 F.Supp.2d 243, 261 (W.D.N.Y.2011)) (citing cases).

Schwartz's obesity was noted by multiple doctors as a significant factor in relation to her ability to work. Dr. Dicpinigaitis counseled Schwartz that her obesity contributed to a guarded prognosis for chondromalacia patellae. Tr. 289. Schwartz was then referred to Dr. Klonsky, a bariatric surgeon, but was told to lose enough weight to make her a candidate for this surgery. Tr. 317. Dr. Shestack advised Schwartz, when she complained of continued pain in her lower back, knee, and hips, to lose weight and follow up with Dr. Klonsky regarding bariatric surgery. Tr. 552. In short, it was evident from the record that Schwartz's obesity contributed to a limitation of function, and the ALJ should have considered it in formulating the RFC.

## CONCLUSION

For the reasons set forth above, the Commissioner's motion for judgment on the pleadings is denied, and Schwartz's motion for judgment on the pleadings is granted to the extent it seeks remand. This matter is remanded to the Commissioner of Social Security for further proceedings consistent with this Memorandum and Order. The Clerk of Court is respectfully directed to enter judgment in accordance with this Memorandum and Order and to close this case.

SO ORDERED.

Dated: Brooklyn, New York
      March 31, 2021

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge